District of Illinois and the Western Division. The plaintiff claims three claims for retaliation, racial retaliation, racial discrimination, and hostile work environment. We believe that the district court improperly decided various issues that support plaintiff's claims, didn't provide or weigh the evidence in a light most favorable to the plaintiff, specifically relative to the hostile work environment claims. But your client, when warning planted the noose or whatever, your client wasn't upset at all. It's a joke, you know, that's warning, that's what warning is like. So what happened to change his mind, make him think, you know, this is discrimination? Right, well, it wasn't, that's the narrative that appears to be created by the defendants. In fact, when the plaintiff discovered the noose initially in November of 2012, he put it in a bag, took a photograph of it first, put it in a bag, threw it out. The next morning he returned to work and there was another noose right adjacent to the entrance door of his newly assigned work area. Now he took that noose to the NIU Police Department and he left it with the dispatcher and made a report. What about his initial statement? His initial statement, are you referring to the email that he sent to his supervisor? Whatever it was when he, you know, treated the whole thing as a joke. Correct, that would be the email that was sent to his supervisor a couple, four or five days after reporting it to the NIU Police Department. Now the impetus of that email was to convey to his supervisor, Ms. Richards, that it was no big deal to him because he had spoken with the NIU Police Department and they directed him or they advised him or suggested that in order to develop some, it would benefit them in their investigation if he played it cool. If he made a big deal out of it, it could potentially cause the individual culprit responsible for the noose to, you know, protect himself as opposed to making it seem like it wasn't that big of a deal to him. Now he reported it to the police department and nothing happened afterwards and he went to the compliance officer at NIU and he reported it to her and he showed her a photograph of the first noose that he discovered. She had her assistant make a copy of that photograph. That photograph has not been produced and it's claimed that it never took place and the noose that the plaintiff dropped off at the police department has also vanished. No one knows where it is. Mr. Rezati, after these noose incidents on November 12th and 13th of 2012, has there been any recurrence? Subsequent to the, in the record? First in the record. In the record, no. Has there been anything further outside the record? Subsequent. To my knowledge, there has been. So he discovered these nooses and there was an investigation. He didn't hear anything back from the NIU police department so he took it upon himself to contact one of the deputy chiefs, Deputy Chief Mitchell, for a status on the investigation. Deputy Chief Mitchell advised him that there was going to be a couple interviews taken. Plaintiff was interviewed by a detective and another employee in the building services department was also employed, John Holmes. He was given a recorded statement by Detective Mojica in February of 2013, so four or five months after initially reporting the noose. Now that recorded statement, the statements made by Holmes, suggesting or demonstrating that nooses were found on the premises of the services department, building services department, for years prior to November of 2012. I've read Mojica's testimony about that. It's awfully vague. Do we have access to, was Holmes questioned? Is his interview in evidence? Is it just Mojica's account of it? The testimony was based on the recorded evidence that was taken in February, February 13th of 2013 of Holmes. Okay, but that recording is not in evidence, is it? The recording is in evidence. The response to summary judgment was based on the testimony of Mojica and that testimony was taken pursuant to an official investigation in his duty as a detective with the NIU Police Department. If you're relying on 8038, it doesn't get you there. You've got Mojica on the stand. You don't need 8038. What you need is some way to get Holmes' statement into evidence for the truth, for its truth. How do you do that? Holmes testified as well that he provided, strike that, Mojica testified that he conducted this interview and it was recorded and it was conducted pursuant to an official investigation. Right. So why does that make it admissible? Because it was an exception to the hearsay rule pursuant. Which one? 8038. Now 8038 would let you put in Mojica's written report without Mojica. Okay? It doesn't mean that everything a witness says to a police officer is admissible for the truth as if that witness had given a deposition or an affidavit. Okay. So what other basis do you have for getting Holmes' statements in for the truth? We have Rhonda Richards' testimony that she was aware of the statements that Holmes provided to Detective Mojica. We also have Holmes testified that he provided statements to Detective Mojica. So where was the noose when Cole and your client found it? He was just assigned a new work area after he made his ethics complaint. He made an ethics complaint in October. It was discovered in a filing cabinet. The filing cabinet was empty. And he discovered it or someone else? He discovered it. What was he doing in the filing cabinet? He was just assigned a new work space and this was his new work area in Stevenson North. So he finds the noose and he writes this note about the warning. No, he takes a picture of the noose and he throws the noose away in a garbage bag. And he does what? And he put the noose in a... In a bag. He sealed the bag, threw it out in a dumpster. And then he writes this note. Five days later, after speaking with the NIU police department. Okay, so what happened to the noose? So the noose is thrown into the garbage and then what happens to it? He throws it in the garbage. He wakes up the next morning, goes to work and he finds another noose outside of the bag that he put it in. So we don't know if it's the same noose or it's a different noose. We don't know. We don't know whether or not it's the same noose or a different noose. Well, I don't understand. You said another noose. You said he found another noose. He found... That implies two nooses. Two discoveries of a noose. Whether it's the same noose... The noose has been taken out of the garbage bag. And it's sitting there on the floor or is it back in the filing cabinet? It's right on the top of the dumpster. And the dumpster is right adjacent to the entrance door where he walks to work. You don't know whether it's a new noose or an old noose. There's no way of knowing that. We have no way of knowing that. Okay, assuming it's the old... Let's make it simple. Assuming it's the old... Alright, that's the second coming of the noose. Now, what happens next? Where does the noose go next? He takes the noose to the police department. The second discovery, he walks over to the police department and he hands it to the dispatcher. Is the noose in a bag? No. He's just carrying it? He carries the noose. He's walking through the street carrying a noose? Correct. Okay, so he gives it to the police. He gives it to the police. What do they say? And they tell him that someone will be in contact with him. So she's going to give it... So the police hold on to the noose or he walks it back? They take the noose in custody. The noose remains in NIU custody. Where is the noose now? It's a good question. Nobody knows. What's the time frame? Was it back in 2012? He said it didn't bother him, right? He says that in an email after he has a conversation with two NIU police officers who told him to play it cool. Because if he got aggressive or he got overly emotional about it, it wouldn't help his work environment. And it wouldn't help them in their investigation. Two years later, more than two years, less than two years later, And in 2014, he claimed he was offended by it. Well, he went to the compliance officer in 2013 with a photograph of the first noose and told the compliance officer that he was offended by the fact that he was treated by his supervisor negatively for discovering the noose. She complained to him that he discovered the noose. She basically said, you should have got rid of the first noose better. And she also put a remark in his evaluation indicating that he didn't get rid of the noose good enough. Well, I don't understand. He did take it to the police. Why isn't that adequate? Well, he explained to her that he found the second discovery. So she yelled at him because she claimed that he should have got rid of the first one better. Handle the first one? You mean he shouldn't have put it in the garbage bag? He should have got rid of it better. She said, basically make it disappear so it would never come into existence again. So she didn't like the idea that he was taking it to the police. Correct. And then we have the... But all this stuff, I don't understand what that has to do with the offensiveness of the noose. That is, if she says to him, it would be better if you just, I don't know, burned the noose, thrown away the noose, put it back in the filing cabinet where it wasn't bothering anybody. What does that have to do with discrimination? I don't see that. Well, if you look at the events leading... They're embarrassed by the noose. So the question, what do they do with the noose? Nobody wants to have a noose premise in his working anywhere. But that's very different from saying that someone is trying to intimidate your client because he's black by placing a noose in the workplace. The noose is gone, long gone. So what's the problem? Well, if you look at the history leading up to the discoveries of the noose, very hostile environment. He was treated differently than any other foreman in the building services department. But that's a separate point. There's no evidence that whoever... There's no evidence that the noose was placed in the filing cabinet in order to... The very first day he was assigned to that work area. Don't interrupt me. Would you please let me finish my sentence? What's the evidence that the noose was placed in the filing cabinet in order to intimidate or frighten Cole? Well, it's not just that one incident. The subsequent day, he finds the same one after he throws it out. And we also have... Wait a second. Subsequent days? The very next morning, he finds another one. That's a day. A day. Are there more nooses after that? Are there nooses after that? More nooses? In the record, there is no evidence in the record of subsequent nooses after the second discovery. However, there is testimony that there were nooses prior to that, years prior to that. And there's also testimony that newly received that there is still nooses being discovered on the premises. It's not evidence in the record. It's information that I've received. Okay. Well, why don't you save the rest of your time, Mr. Bresciani. Ms. Welsh? Good morning, Your Honors. May it please the Court, I'm Mary Welsh. I'm here on behalf of the university and the individual defendants. The question, of course, this case presents is whether the plaintiff come up with enough evidence for a reasonable jury to find in his favor on any of his three claims. And the answer to that question is no. I think it's pretty clear on the discrimination claim, there are only two materially adverse employment actions, the demotion for which there is a comparable, Ms. Stone, who was demoted at exactly the same time by exactly the same person, and the 10-day suspension. And there is another person, a white male, who was also suspended for 10 days by the same person, Richards. So that claim doesn't go anywhere. Similarly, the retaliation claim, which can be only against the university, the only protected conduct that the plaintiff identified as summary judgment was the ethics complaint. And pretty much every incident in the laundry list was in the ethics complaint. So there can't have been a causal link between the complaint and subsequent events. Because, as I say, the laundry list events occurred before the ethics complaint. So we get to the crux of the case, which is, in fact, the hostile work environment claim. Now, again, the laundry list, there's no evidence, as the court indicated, there's no evidence that the laundry list events had any racial component whatsoever, or that they affected the terms and conditions of plaintiff's employment. And, in fact, plaintiff was there from 1998 until, well, the suit was filed in 2014. And other than the noose incident, there was no complaint about any, until just before that, there was no complaint about any racial problem. So the laundry list, at least to plaintiff, posed no hostile work environment. If you don't report it, you can't expect an abusive work environment to be corrected. And, again, plaintiff also says that he was the only African-American foreman or sub-foreman. Now, this is true, but he wasn't the only African-American employee in building services. In fact, his team, he says, his students, at one point, all his student workers were African-American. And it seems incredible, or remarkable, perhaps is a better word, that in the 14, 16 years that plaintiff was there before this noose incident, that there was not a single report of a racial incident, no racial epithet, there's no Confederate flag, there's none of the things that you see. Is there any evidence about who might have taken the noose out of the garbage bag? Well, interestingly enough, in the email the plaintiff sent to his boss, Richards, which, again, was five days after he found it, five days, he waited five days to report this to his superior, he says it must have been one of the food service workers. That's plaintiff's speculation to Richards. So, no, we don't know. And thus, we don't know if it's the same one that somehow fell out of the bag, or we don't know if there was a second one. But, again, plaintiff talks about there was evidence that there have been nooses around for years. Well, first of all, the problem with this evidence is that it's inadmissible. It comes from Holmes. And, in fact, it's double hearsay, because what Holmes tells Richards, when Richards asks Holmes, who's also the guy who was interviewed by the detective, Richards asks Holmes, so what do you know about this? And he said, I heard rumors. I never saw any noose, but I heard rumors. And he also says workers knew about this, but there's no evidence in the record, even inadmissible evidence in the record, that any supervisor knew about any noose except for Hart. There's inadmissible evidence about Hart, that Hart saw warnings noose, told him to take it down, so he remedied the situation immediately. And there's... Didn't somebody take the noose to the police department? The plaintiff took the noose to the police department, right. But I'm speaking pre this incident. There's simply no evidence that, and certainly no admissible evidence, that there was anything other than the one noose that Hart told Warning to put away, and apparently he did, because that was years ago, that's what they said, years ago in this inadmissible evidence. Do we know how long the noose was in the filing cabinet before it was discovered by Cole? We do not. When the supervisors were notified of the November 2012 noose incidents, is there any evidence they took any remedial action? Well, let's see what happened here, okay. I suppose the most cogent answer to your question is that Richards asked the plaintiff when she saw him a couple of days after she got the e-mail from him that said, I'm not bothered, it's a joke, you know, she said, well, should I pursue this? I mean, she asked him directly, should I pursue this? And he said, I'm not bothered by this. So he shut down any, he himself shut down any corrective action. Now, maybe he said this because he got bad advice from the police, I don't know. But, again, you know, employers, supervisors cannot be held liable for not taking corrective action that they are dissuaded from taking. So, again, this, you know, the noose was found on the 13th. He found it, he put it in a bag and put it in the trash. Did not report it to his supervisor, did not report it to anyone. So there's, you know, certainly some question about whether this was subjectively offensive. But let's assume it was. And he still just put it away. The next day he finds it again. There's no evidence that it's right by his door, his entry door. It's only that it was found outside. There's no evidence what, I didn't hear you. The plaintiff's counsel just said that it was found, and in the reply brief, that it was found outside the plaintiff's entrance door. But there's no evidence to that effect. It said it was found apparently with the garbage on the loading dock. It's outside the building for sure. So there's no evidence, you know, from which a jury could find that it was left for him to find because we don't know what his relationship was to that location. If he goes to the dock every day, if that's part of his job. We don't know that. You mean the noose was not in the room with the filing cabinet? No, the first day, when he found it initially, it was in the filing cabinet. No, I know it was in the filing cabinet. But when he next found it, it wasn't in the room? In the room? No, no, no. It was outside the building, apparently with the trash. That's what he said. I think one of the food service worker guys, you know, found it. Somehow it came out of the bag, apparently. And so he still doesn't tell his supervisor. He still doesn't tell Richards. He still doesn't tell anybody else. Except he takes it, he takes the picture, and he takes it to the police and he drops it off with the dispatcher. Then, three days later, he finally sends the email to Richards, his supervisor. And he doesn't contact Nicholas. He doesn't contact anybody else right now. He sends it to Richards. And, again, the contents of the email would not put any supervisor on notice that corrective action had to be taken. And, again, you know, you can't be held liable for negligently not correcting something that you're not put on notice needs to be corrected. So, okay, so then, a few days later, he meets with Richards. And he reiterates to her, you know, it's not a problem, doesn't bother me. And when she directly asks him, do you want me to pursue this, he says it didn't bother me. That's in her deposition? Yes, yes. Was it disputed? No, I don't believe so. Okay. Can we agree, Ms. Welsh, that, at least for purposes of summary judgment, it's reasonable to infer that a motive for hiding a noose in the plaintiff's file cabinet was racial? I'm sorry? Can we reasonably infer that the motive for leaving a noose in the plaintiff's work area was racial? If we knew that somebody had intentionally left it there, I would say yes. Okay. With regard to the pursuit. We're not just on that point of the case. I just want to make sure we understand. There's no dispute about the racial significance of the symbolism, is there? Certainly a reasonable jury could find that it was racially linked, yeah, of course. Well, do we know how long the noose had been in the filing cabinet? We do not. How long had that been Cole's office? He was just, as the plaintiff said, he was just moving in to it, and it was Waring's. Again, plaintiffs, and his dad's plaintiffs, speculated that Warning had left it for him as a joke, or maybe it was in the e-mail, but that was his. We don't know, but it could have been there for a long time. It could have been there forever. It could have been there that morning. We don't know. The pursuit, just to check. Did Warning confess? Warning doesn't appear anywhere in the record. Really? Yeah, he's only sort of secondhand. The pursuit quote is at page 2382. I'm sorry, 23? 2382. So then, and the plaintiff also said that he went, just this morning, went to Cliff to complain about this, to report this. That's not correct. In fact, plaintiff was with Cliff to talk about a prior complaint he had made, and Cliff asked him about the incident. She had heard about it from Perez, I believe, maybe from Richards. She had heard about it. I think Perez had been asked to send her the pictures, and so she was notified about it. She was on alert. And so she asked him about it, and he told her it didn't bother me. And, you know, this is her job. Her job is to look into these complaints, you know, complaints about racial issues and so on, discrimination. And that's at page 936. So every time plaintiff had an opportunity to ask for corrective action, he didn't take it. Now, I'm not faulting him. Maybe he got bad advice from those police. But what I'm saying is that you can't hold somebody responsible, the university or the individual defendants responsible, if they were not asked to take corrective action and, in fact, were dissuaded from doing so by the plaintiff himself.  In Porter, you know, there were threats. There was this atmosphere of racial hatred, threats against the family and so on. In other cases, you see Confederate flags. You see all kinds of stuff. In this case, you have this one incident that plaintiff took five days to report to his supervisor, and each time he reported to the people who could take corrective action and thus were the only individual defendants who should have anything in this case, which would be his supervisor Richards and her supervisor Dower, perhaps, who also saw the email. All of these people saw the email, and that was what they knew about plaintiff's concern, lack of concern about this. So, again, all of them, if you looked at this email, you would be dissuaded from taking any corrective action. And Richards wasn't initially dissuaded. Again, she said to him, do you want me to pursue this? And he said, it didn't bother me. No reasonable jury could find that any defendant could be held liable on any of plaintiff's claims here unless the court had. Ms. Walsh, if I could, I just wanted to ask you about a different kind of fact pattern, but where I frankly have seen before where somebody in a protected class of employment, the only woman on the job, the only African American on the job, for example, is subjected to various epithets, forms of harassment. Some of it's explicitly racial, let's say, and some of it is just harassment. Would you agree that at least in some circumstances it would be possible to kind of argue that the whole pattern was racially motivated? I'm not saying that that's what's going on here, but as we try to approach how to decide this case, it seems to me we need to leave room for the other kind of case. Well, that's sort of what this court was talking about in Bowman, I think it is, Bowman, the case that we cited. You know, just the fact, you know, and I personally have been in a protected class and have this, you can imagine. And so, you know, these things, you know, you get treated differently. You know, I was offered secretarial jobs, you know, when I first came out of architecture school. So you get treated differently. But unless there's something that you can link to, you know, you have to have something that, like, you girls, you're all like this, just even one comment like that might be enough. But you need at least one. You can't, you can't, a plaintiff can't win by saying, and that's what Bowman says, I'm the only person in my class. And in fact, that's not true, because he's not the only African-American person in building services. He was just the only African-American sub-foreman or foreman. And you would think that in this, I mean, I was in the construction-related industry for a very long time. I heard a lot of bad language. And you would think that in this kind of environment, you would hear at least one racial epithet, at least one something. And there's no evidence of that. There is simply no evidence. The noose was the only, the noose was the only. Correct, correct. And there was nothing ever attached to it, no language, no. No, no. And, you know, and even if we accept. I mean, it's certainly inferential. It has to do with racial. Sure, absolutely. I mean, we're accepting for purposes of judgment that it was, you know, that it has an objective and subjective racial component to it. Certainly in summary judgment, we would have to accept that. But, again, you know, you cannot find, you know, the defendants here who were dissuaded from taking corrective action cannot be held liable for negligently not taking corrective action. Unless there are questions. We ask that the court confirm. Okay, thank you very much, Ms. Wells. Mr. Rosati? Okay. Let me ask you a question. Sure. Did you depose Warning? Fred Warning had retired years prior, decades prior.  He had retired at least 10 years prior. And he's alive? I'm not aware whether or not he's alive. He could be deposed even though he's not working. He could have been. But he's alive. No, he's not. That is more difficult. I need a seance or something. So may I continue? Okay. So he was given bad advice by the police, obviously, because they didn't investigate it after he reported the news. And now because they didn't investigate it, we have no idea who put it there, even though we have the testimony from Mojica that provides that Holmes, just 30 days prior to the initial discovery, Richards, Holmes, and another supervisor discovered a noose in that exact same area, just 30 days prior to Jerome being reassigned to this new work area. It's also important to note that prior to being assigned to this new work was kicked in off of the hinges. All his supplies were placed on a cart. It's also important to note that Jerome made an affirmative action complaint to NIU prior to discovering the noose because he had the police, Mojica told him, that the police were watching him for no reason, no good reason, and that it was Defendant Tammy Pulak who contacted the police department to have him surveyed for no reason. Because of that, he went to affirmative action and made those complaints based on what he believed to be racially motivated. There's also testimony in the record that there was a sign that said no blacks allowed past this point in the building services department prior to discovering the noose. Where is that evidence? It's in Jerome's testimony. Was it something that he had seen, something he'd heard about? One of his student workers notified him that there was a sign that said no blacks allowed past this point. Jerome went to Richards, and then Tammy Pulak had notified her of that fact. So that is also, in plain estimation, racially motivated, a racially motivated circumstance. Second, to address the counsel's point relative to him being not the only African-American in building services department, that's not the standard. The individuals must have the same responsibilities. A building services worker has different responsibilities than a supervisor. Supervisors supervise the work, et cetera. So you can't compare an apple to an orange relative to the similar situated argument. Also, it's not plaintiff that's putting forth these two comparators. Defendants are bringing forth these two white individuals as a comparator in an attempt to suggest that he wasn't the only one that was demoted. Well, these individuals didn't have their office door kicked in. They were assigned a budget. They didn't have commodities purchased in their names without their knowledge, which created a hostile environment for Jerome because he was aware of news reports that there were some improprieties taking place at the university prior to that. Then he finds out that people are buying commodities in his name without his knowledge. So it was reasonable for him to believe that he could potentially be blamed for misappropriating university funds or worse. He made these complaints. He also took the photograph of the noose to Cliff after he reported it to the police department. So he makes a photograph. Did you say Warning retired 10 years ago? He retired. That's impossible. I mean, the incident was in 2011, wasn't it? The incident, the discovery was 2012. We have testimony from Holmes. What, do you think Warning had retired and then he came back and snuck the noose into the filing cabinet? He's retired, but he... You're referring to the email then, I guess, the content of the email where it references Warning? It's the filing cabinet. Someone put a noose in the filing cabinet and apparently it was Warning, right? We have no idea because the investigation was stopped. It would be all speculative. Yeah, but Cole thought it was Warning. Cole wrote that email after he reported it and consistent with what he was told. What about Warning? You say he's retired 10 years ago? He was retired. I can't give you a date and I don't want to give a false information, but he... I don't understand why he didn't depose him since Cole thinks he's the one who put the noose in the filing cabinet. Well, we had the testimony that it was discovered just a month before he was moved, located by Holmes in Richards. If they found a noose 30 days before he's being assigned to this work area, he's only the African-American, how is it still around? There's no corrective measures. And to suggest that... Answer my question. I don't know why he didn't depose Warning since Warning is apparently the person who planted it in the filing cabinet. That seems to be what everyone thinks. You'd think it would be important what he said. Maybe he said he hates black people. Maybe he says we just kid around a lot. Okay. Well, thank you very much, Mr. Rezati and Ms. Welsh.